[No. B045047. Second Dist., Div. Six. June 27, 1991.]

LONG BEACH EQUITIES, INC., Plaintiff and Appellant.
COUNTY OF VENTURA et al., Defendants and Respondents.

[No. B046558. Second Dist., Div. Six. June 27, 1991.]

CITY OF SIMI VALLEY et al., Petitioners, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
LONG BEACH EQUITIES, INC., et al., Real Parties in Interest.

## COUNSEL

Hamilton & Samuels, Paul R. Hamilton, Karen J. Lee and Deborah M. Rosenthal, for Plaintiff and Appellant and Real Parties in Interest.

James L. McBride, County Counsel, and Dennis L. Slivinski, Assistant County Counsel, for Defendants and Respondents.

John Torrance, City Attorney, Marjorie Baxter, Assistant City Attorney, Freilich, Stone, Leitner & Carlisle, Katherine E. Stone and Margaret A. Sohagi for Defendants and Respondents and for Petitioners.

Burke, Williams & Sorensen, J. Robert Flandrick and Virginia R. Pesola as Amici Curiae on behalf of Petitioners.

No appearance for Respondent Superior Court.

Baker & McKenzie and Robert H. Philibosian for Real Parties in Interest.

Ronald A. Zumbrun, Edward J. Connor, Jr., and Timothy V. Kassouni as Amici Curiae on .behalf of Real Parties in Interest.

**OPINION**

**GILBERT, Acting P. J.**—Long Beach Equities, Inc. (LBE) desires to build 249 single-family residences on a 250-acre parcel of land it owns adjacent to the City of Simi Valley (City). LBE contends that land use regulations of the County of Ventura (County) and City, on their face and as applied, will so greatly delay its development plans as to render them economically infeasible.

We hold that this suit is not ripe for adjudication. We affirm the judgment for County and grant City's petition for issuance of a writ of mandate to compel the trial court to enter an order sustaining City's demurrer without leave to amend.

LBE sued these entities seeking damages for inverse condemnation, among other things.[1] The trial court sustained County's demurrer to LBE's first amended complaint without leave to amend. LBE moved for reconsideration and proffered a second amended complaint. The court denied the motion and sustained City's demurrer without leave as to several counts, but

---

[1]Complainant Marr Ranch Associates is not a party to this appeal. Also, LBE has sued the County Board of Supervisors, the Ventura Planning Commission and the Simi Valley City Council. We shall refer to all County and City defendants as County and City, respectively.

overruled that demurrer on counts for inverse condemnation, denial of due process and declaratory and injunctive relief.

LBE appealed the judgment entered on County's demurrer and the ruling rendered on its motion for reconsideration. City filed a petition for a writ of mandate to compel the trial court to vacate its order overruling the demurrer. We have consolidated these actions on appeal in the interest of judicial economy and to aid in the resolution of this lawsuit. (*Omaha Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1266, 1272 [258 Cal.Rptr. 66]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 62, pp. 86-87, § 64, pp. 88-89, § 65, pp. 89-90.)

## STANDARDS OF REVIEW

LBE has the burden to prove that the trial court abused its discretion in sustaining County's demurrer without leave to amend. (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The City has the burden to show that the trial court's order is erroneous as a matter of law and that it will suffer harm which cannot be corrected on further appeal. (*Omaha Indemnity Co.* v. *Superior Court, supra*, 209 Cal.App.3d at pp. 1273-1274.)

We must construe the allegations of LBE's voluminous complaint liberally to attain substantial justice among the parties. (Code Civ. Proc., § 452.) We deem true all material and properly pleaded facts. (*Pan Pacific Properties, Inc.* v. *County of Santa Cruz* (1978) 81 Cal.App.3d 244, 251 [146 Cal.Rptr. 428].) We also consider all documents which have been determined by the trial court as appropriate for judicial notice, many of which are mentioned in the complaint. (Code Civ. Proc., § 430.30; *First English Evangelical Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353, 1368 [258 Cal.Rptr. 893].)[2] They include resolutions, reports and other official acts of County and City. (*Pan Pacific, supra,* at p. 255, fn. 2.)

We may not consider conclusions of fact or law, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts.

---

[2]The California Court of Appeal heard *First English Evangelical Lutheran Church* v. *County of Los Angeles, supra,* 210 Cal.App.3d 1353 (hereinafter cited as *First English II*) on remand from the United States Supreme Court in *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378] (hereinafter cited as *First English I* ).

(See *Pan Pacific Properties, Inc.* v. *County of Santa Cruz, supra*, 81 Cal.App.3d at pp. 251, 255, fn. 2; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 259, fn. 6 [65 L.Ed.2d 106, 111, 100 S.Ct. 2138].)

### The Complaint - The Facts

On June 25, 1969, the Ventura County Planning Commission first adopted guidelines for orderly urban development (Guidelines). The Guidelines provide policies, standards and criteria to evaluate applications for zone changes from rural to urban land use classifications and for "related land use development matters."

The Guidelines initially were adopted to assure the "efficient provision of urban services and sound urban land use planning" and to avoid "the problems and costs associated with urban sprawl" through coordinated planning with other local government entities.

Those Guidelines provided that urban growth of developing communities in Ventura County should proceed in a compact and logically expanding form which includes satisfactory permanent open space areas within physically developed land.

The revised Guidelines of 1976 and 1985 continued the theme that urban development should occur within existing, incorporated cities because cities provide a full range of municipal services. County removed the language regarding retention of permanent open space within developed land in its revised Guidelines.

According to the Guidelines, land uses which would be allowed by County should be equal to or more restrictive than those uses allowed by City within a city's sphere of influence. Before new urban development proceeds, the land should be annexed to City to ensure that the full range of urban services are provided by municipalities. Within "areas of interest" to a City, as here, such development should be allowed only within existing communities.

The Ventura County general plan, with its discussion of stages of development, may be used as a tool to evaluate proposals for urban development.

As of 1980, City's general plan designated the subject area for residential development of a maximum of 1,100 units and for a shopping center. On September 15, 1981, County's open space plan designated the subject property as having an "Urban Reserve overlay." This overlay contemplates residential development, but it encourages developers to deal directly with the appropriate city to proceed. County also adopted City's general plan as the Simi Valley area plan (the SVAP) portion of the County's general plan.

LBE alleges that in adopting the SVAP, the County expressly recognized that the property should be developed with urban uses in the densities stated in the text because: (1) the SVAP showed that over 80 percent of the area's valley floor had already been developed; (2) private and public utility and sewer infrastructure had been extended to meet the needs of the development and is more than adequate to provide service at comfortable levels of safety, adequacy and efficiency; (3) development at the density designated is necessary to meet the residential housing needs of the area and to fulfill the County's regional housing obligations; (4) the County recognized the City's desire that the property be developed as shown in the City's general plan.

In 1984 LBE purchased the subject 250 acres of land located in unincorporated territory adjacent to and within the "area of interest" of City.[3]

LBE alleges that before it purchased the property, the City agreed that if LBE submitted a specific plan for 1,100 units, it would be approved. Pursuant to City's request, LBE prepared such a specific plan. It paid all fees for that plan and for an environmental impact report (EIR) on the plan.

The City council then became the applicant for the specific plan which provided for development of 1,730 units. To accommodate new grading ordinances, the specific plan and a proposed general plan amendment were modified to reduce the number of units to 1,059 and to eliminate the shopping center.

LBE helped to pay for oversized infrastructure adjacent to its property which could service the development project at the density set forth above. LBE shared in engineering costs for easements it granted. All necessary infrastructure and public services for the projected residents of the property are now in place. LBE asserts that the property could be serviced by county service districts.

In late 1985, City passed an urgency interim ordinance. The ordinance imposed a partial moratorium on providing approval for various land use

---

[3]Marr Ranch Associates purchased approximately 2,500 acres in the same area.

permits, particularly in hillside areas, until City could review and revise its general plan. City enacted the ordinance after it monitored development and land use trends in the community. It realized that various land uses then permitted might conflict with proposed revisions to its general plan. City wanted to consider those uses "in an atmosphere of land use stability . . . ." LBE alleges that the ordinance "effectively imposed a moratorium on all processing of major new projects" including its own project, "until the City could review and revise its General Plan."

In July 1986, City adopted a temporary growth management plan which would severely limit the number of building permits to be issued annually. The plan takes note of population trends and includes provisions for reevaluation in 1991 based on facts obtained from the 1990 census. Those facts are to be considered in relation to the criteria set forth in the measure, in the revised general plan and in the County population guidelines. The plan is effective until January 1, 1996.

The plan requires that a developer obtain approval of its proposed project from City, among others, to become eligible for a waiting list to apply for building permits.

The revised City general plan, adopted in October 1988, designated approximately 325 units for LBE's property. LBE then prepared, but did not file, a tentative map for 249 single-family residences to meet the new design criteria of City and County.

City now requires that another specific plan on the entire property be prepared. LBE alleges that this requirement is illegal, and on information and belief alleges that it would take up to 10 years to proceed with the proposed 249-unit development. LBE would be required to complete a specific plan and an EIR, process other required land use applications and get in line to compete with other development applicants for available building permits.

LBE asserts that "[t]he inescapable fate of delay" is clear and that its tremendous carrying costs cannot be overcome. It alleges that its property would diminish in value until it is worth nothing.

Because it "recognized" the "impossibility of developing within the City's jurisdiction, . . ." LBE turned to the County which "foreclosed all development of the Property whatsoever."

County amended its general plan on May 24, 1988, allegedly to foreclose LBE's development project. County downzoned much of the property to OS-160 (open space zoning which allows one unit per 160 acres).

Around August 1988, County would not let LBE make application to process the project through County. County told LBE it must first apply for a general plan amendment and promote the adoption of a new area plan for Simi Valley. LBE alleges it was told that it would take two to three years to adopt a new area plan.

LBE began to seek a general plan amendment to amend the County general plan for development of the 250-acre parcel. The County Board of Supervisors considered LBE's prescreening application on January 17, 1989, and denied it, stating that any development of the proposed project must occur in the City after annexation.

*The Complaint - The Theory*

LBE recites the foregoing allegations to support its seven causes of action. The first is for inverse condemnation. LBE states that City and County's actions in rescinding the area plan, forbidding all development in the urban reserve overlay, downzoning the property, imposing a de facto or actual moratorium (on development) and imposing a growth-control plan to pre-clude large scale residential development has resulted in a de facto taking in violation of article I, sections 7 and 19 of the California Constitution and of the Fifth and Fourteenth Amendments to the United States Constitution.

LBE alleges that these actions deprive the subject property of substantially all its value, render it unmarketable and forbid substantially all reasonable economic beneficial use of the property, thereby thwarting its reasonable investment-backed expectations.

The second cause of action is for denial of substantive and procedural due process. LBE asserts that the defendants have restricted the use of its property to open space without a legitimate purpose and without evidence to support such action.

The third cause of action alleges denial of equal protection because defendants have limited the use of LBE's property to open space in contrast to uses allowed the owners of comparable properties in the County.

The fourth cause of action seeks relief for deprivation of civil rights under 42 United States Code sections 1983 and 1988. LBE alleges that defendants knowingly and wrongfully deprived it of due process, equal protection and just compensation under the California and federal Constitutions under color of state law.

The fifth cause of action is captioned conspiracy to deprive plaintiffs of civil rights. It realleges the various actions of City and County as a pattern of conduct intended to deprive LBE of its legal rights under color of state law.

The sixth cause of action seeks declaratory and injunctive relief as to the rights, duties and obligations among the parties regarding the various actions alleged in the complaint.

Lastly, LBE seeks a writ of mandate under Code of Civil Procedure section 1085 for abuse of discretion by County in acting in the manner described above.

LBE alleges that the City and County have imposed "an ever changing series of obstacles on the development of the Property," and have therefore made "development of the Property a practical impossibility . . . ." Further, LBE alleges it "exhausted all reasonable administrative remedies," and "[f]urther attempts to secure relief through administrative procedures . . . would be totally impractical and futile."

DISCUSSION

■ To state a cause of action for inverse condemnation, LBE must plead facts which show either that: (1) the application of the general zoning laws to its property does not substantially advance a legitimate state interest; or (2) such laws deprive it of substantially all economically viable use of its land. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [65 L.Ed.2d at pp. 111-112]; also see *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141], which refined the first prong of the *Agins* test to require that the regulation advance the precise state interest which avowedly motivated it.)

■ No precise rule exists to determine when property has been taken by inverse condemnation. (*Agins* v. *Tiburon, supra,* 447 U.S. at pp. 260-261 [65 L.Ed.2d at pp. 111-112]; *MacDonald, Sommer & Frates* v. *County of Yolo* (1986) 477 U.S. 340, 348-349 [91 L.Ed.2d 285, 293-295, 106 S.Ct. 2561].) We start with the proposition that government regulations are presumed to be motivated by and to reasonably serve their avowed purposes. (*First English II, supra,* 210 Cal.App.3d at p. 1372.) We then weigh the private interest asserted against the public's interest as shown in enactments passed in the exercise of the state's police powers. Where the public benefits greatly, it is constitutional to restrict the use of one's land. (*Id.,* at pp. 1366-1367, fn. 10.) In some cases, no compensation may be required even if almost all uses are taken. (*Id.,* at p. 1366.)

*Facial Attack on Legislation*

■ Local government legislation is constitutional on its face if it bears "a substantial relationship to the public welfare . . ." and inflicts no irreparable injury on the landowner. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 261 [65 L.Ed.2d at p. 112]; *Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365, 395-397 [71 L.Ed. 303, 313-315, 47 S.Ct. 114, 54 A.L.R. 1016].) This is true even where a substantial diminution in value of the property is alleged. (*Agins, supra,* at p. 261 [65 L.Ed.2d at p. 112].)

■ Both County's Guidelines and City's Growth Management Ordinance satisfy this test. The County enacted the Guidelines to promote efficient and effective delivery of community services and to conserve the resources of County by encouraging urban development to occur within cities. The Guidelines emphasize annexation as a means to accomplish these purposes.

City enacted its ordinance "to protect the unique, hill-surrounded environment; enhance the quality of life; promote public health, safety or welfare and the general well-being of the community . . . ." By limiting the rate, distribution, quality and type of residential development on an annual basis, with periodic reviews of the ongoing situation, City seeks "to improve local air quality, reduce traffic demands . . . and ensure that future demands for such essential services as water, sewers and the like are met . . . ."

Courts have long recognized the legitimacy of such ordinances, because such laws are designed to protect the public weal. (See *Agins* v. *Tiburon, supra,* 447 U.S. at pp. 261-262 [65 L.Ed.2d at pp. 112-113], citing *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 129 [57 L.Ed.2d 631, 651-652, 98 S.Ct. 2646]; *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 9 [39 L.Ed.2d 797, 804, 94 S.Ct. 1536]; *Euclid* v. *Ambler Realty Co., supra,* 272 U.S. at pp. 394-395 [71 L.Ed.2d at pp. 213-214].) Courts will not interfere with a municipality's determination of policy. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

LBE argues that County and City's actions are designed to thwart LBE's project and that they are contrary to Government Code provisions which support the development of housing, citing Government Code sections 65583, 65580, and 65581. Although these sections promote the development of residential housing, such development is not encouraged when it fails to conserve needed open space and contributes to urban sprawl. (See Gov. Code, § 65560 et seq.)

The state also seeks to assure that open space is conserved wherever possible through open space plans. (Gov. Code, § 65562.) A " '[l]ocal open-space plan' is the open-space element of a county or city general plan . . . ." (Gov. Code, § 65560, subd. (a).) Government Code section 65560, subdivision (b) states that open space is defined to mean, inter alia, "any parcel or area of land . . . essentially unimproved and devoted to an open-space use as defined in this section, and which is designated on a local [or] regional . . . open-space plan as any of the following: . . . [¶] (4) Open space for public health and safety, including, but not limited to, areas . . . required for the protection of water quality and . . . areas required for the protection and enhancement of air quality."

The Guidelines and the Growth Management Ordinance express local legislative determinations: 1. to assure that land continues to be available for the use of natural resources (Gov. Code, § 65561, subd. (a)); 2. to discourage premature and unnecessary conversion of open-space land to urban uses and to discourage noncontiguous development patterns (Gov. Code § 65561, subd. (b)), even though this project is contiguous to developed land; and 3. to preserve valuable open space land by adoption and strict administration of such ordinances or by other appropriate means (Gov. Code § 65561, subd. (c)).

The Guidelines substantially advance these goals by encouraging urban development only within cities to assure the efficient and effective delivery of a full range of municipal services. Although the Growth Management Ordinance expressly acknowledges the need for new jobs, improved shopping facilities and housing opportunities for all the residents of the community, it also recognizes the need to limit growth to preserve water and air quality. (See Gov. Code, § 65560, subd. (b)(4).) Such legislative action is well designed to prevent the ill effects of poorly planned urbanization. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 261 [65 L.Ed.2d at p. 112]; *First English II, supra,* 210 Cal.App.3d at p. 1370.)

LBE's allegations state that as of 1980 the City's general plan slated a portion of the subject property for residential development. LBE also alleged that as of September 1981, the County adopted the City's general plan as the SVAP which recognized that the property should be developed for urban uses.

That County and City have projected residential and other urban uses for the area in their general plans does not entitle LBE to develop its land. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 795-796 [132 Cal.Rptr. 386, 553 P.2d 546]; *MacLeod* v. *Santa Clara County* (9th Cir. 1984) 749 F.2d 541, 548.) The Guidelines and the Growth

Management Ordinance provide substantial, legitimate bases for the protection of the public welfare regarding such development. We may not interfere with such policy. (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d at pp. 604-605.)

LBE acknowledged in its complaint that County's land use plan imposed an urban reserve overlay which encourages developers to deal directly with City so that such development is placed within incorporated cities whenever and wherever possible, as stated in the Guidelines. The open-space plan maps show this urban reserve overlay as of September 15, 1981.

### Ripeness of Attack on Legislation as Applied

■ An attack on regulatory legislation as applied to a particular parcel of property is not ripe for adjudication in inverse condemnation unless the plaintiff shows that: (1) the regulation has gone so far that it has accomplished a taking, and (2) compensation tendered is not just. (*MacDonald, Sommer & Frates* v. *County of Yolo, supra,* 477 U.S. at p. 348 [91 L.Ed.2d at pp. 293-294]; *Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty.* (9th Cir. 1987) 841 F.2d 872, 876.)

■ LBE bears a heavy burden to show that its "as applied" attack is ripe. LBE must first show that City and County have made a "final and authoritative determination of the type and intensity of development legally permitted on the subject property." (*MacDonald, Sommer & Frates* v. *County of Yolo, supra,* 477 U.S. at p. 348 [91 L.Ed.2d at p. 294].) "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." (*Ibid.*)

The developer must establish that it has submitted at least one meaningful application for a development project which has been thoroughly rejected, and that it has prosecuted at least one meaningful application for a zoning variance, or something similar, which has been finally denied. (*Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at pp. 876-877; see also *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 187-188 [87 L.Ed.2d 126, 139-140, 105 S.Ct. 3108]; *Kinzli* v. *City of Santa Cruz* (9th Cir. 1987) 818 F.2d 1449, 1454, as amended at 830 F.2d 968.) Informal or tentative development proposals are insufficient to meet these tests. (*Lake Nacimiento, supra,* at p. 876.)

The test is *not* one of exhaustion of a particular administrative remedy— whether the developer has exhausted all administrative appeals regarding a particular application. The developer must show that it has submitted the appropriate applications necessary to proceed with the particular project and

that it has received a final rejection of those applications. (*Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 186-190 [87 L.Ed.2d at pp. 138-141]; *Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at pp. 876-877.)

The case of *Kinzli* v. *City of Santa Cruz, supra,* 818 F.2d 1449, a case similar to the instant one, illustrates how these rules apply.

The Kinzli family owned land adjacent to the City of Santa Cruz for many years. Gradually the property became surrounded by urban development.

Through a stipulated judgment in eminent domain, the city successfully obtained four acres of the property for construction of a public street. The city promised the Kinzlis that they could develop the property with high density uses once the road was built. The city never built the road.

In 1979, the voters passed a slow growth initiative which limited the use of the property to open space until 1990. The measure precluded the city from providing certain urban services in the area in which the property was located.

The city enacted a greenbelt overlay ordinance to implement the initiative. The ordinance set out the requirements to obtain special use permits and the conditions for extensions of urban services to the greenbelt area. Limited single family and accessory structures could be built upon application for special permits. High density development, formerly available and sought by the Kinzlis, was forbidden.

The Kinzlis tried to sell the property on the condition that residential building permits could be obtained. One potential buyer abandoned an application he filed on behalf of the Kinzlis because a government staff engineer told him that the city could not provide water to the property. The Kinzlis did not submit applications for other uses.

In 1980, the Kinzlis sued the city charging that the ordinance, and the city's conduct regarding the condemnation proceedings, violated federal constitutional and civil rights and rights under California laws.

At trial, the court discussed the merits of the taking claim and denied it. The appellate court found that the trial court erred in discussing the merits because the claim was not ripe. Because the Kinzlis had not submitted a "meaningful" development plan or an application for a variance, the

appellate court held that the claim should have been dismissed. (See *Kinzli* v. *City of Santa Cruz, supra,* 818 F.2d at p. 1455.)

■ Failure to avail oneself of administrative solutions, which might obviate the need to consider constitutional questions, renders a claim for inverse condemnation unripe for adjudication. (*Hodel* v. *Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 297 [69 L.Ed.2d 1, 29, 101 S.Ct. 2352].)

In *MacDonald, Sommer & Frates* v. *County of Yolo, supra,* 477 U.S. 340, the Supreme Court rejected as unripe allegations that a city and county unconstitutionally restricted use of its property to open space when it denied a tentative subdivision tract map to build 159 single and multiple family homes. (Pp. 344, 352, fn. 8 [91 L.Ed.2d at p. 296].) There, as here, the plaintiff urged that any application for a zone change, a variance or other relief would be futile. Its allegations that all principal and accessory uses were no longer permitted and that its property had no value were rejected as speculative and conclusional. (*Id.,* at pp. 345, 351 [91 L.Ed.2d at pp. 292, 295-296], citing *San Diego Gas & Electric Co.* v. *San Diego* (1981) 450 U.S. 621, 631-632, fn. 12 [67 L.Ed.2d 551, 560, 101 S.Ct. 1287]; and *Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 187-188 [87 L.Ed.2d at pp. 139-140].)

■ Denial of approvals for a particular and relatively intensive residential development, as here, cannot be equated with a refusal to permit any beneficial use whatsoever. (*MacDonald, Sommer & Frates* v. *County of Yolo, supra,* 477 U.S. at p. 347 [91 L.Ed.2d at p. 293].)

■ In the instant case, LBE has not submitted an application for annexation to City even though the Guidelines, since 1969, have urged developers who propose projects like this one to do so. LBE did not follow through on its application for a specific plan, nor has LBE alleged that it applied for a zoning change, or sought other favored uses such as senior and affordable housing.

Nevertheless, LBE contends that County has foreclosed all development of its property within County. LBE relies on the following passage from the amended general plan:

"The Urban Reserve overlay designation is applied to all unincorporated land within a city's adopted Sphere of Influence. Although LAFCO has determined these areas to be appropriate for eventual annexation and urbanization, the Urban designation was not applied to all lands within the LAFCO sphere boundaries because it could result in urban development

being permitted without annexation. Accordingly, unincorporated lands within spheres have been designated under this General Plan either as Existing Community, Rural, Agricultural or Open Space. Under these designations, therefore, more intense development could not occur on affected lands until they are annexed."

This language does not foreclose all development, but merely restates County's position since 1969 on annexation. City's Growth Management Ordinance is also a temporary, partial moratorium on certain kinds of development.

If LBE successfully applied for annexation, it could explore other possibilities for development under the Growth Management Ordinance. These possibilities may not reflect what LBE desires to build. This, however, does not constitute an unconstitutional taking. (See *Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 187-188 [87 L.Ed.2d at pp. 139-140].)

LBE cannot take solace in *First English I, supra,* which stated that damages may be available for temporary total takings. In that case, the California courts assumed that a taking had already occurred. (See *First English I, supra,* 482 U.S. at p. 311 [96 L.Ed.2d at p. 261].) Moreover, *First English I, supra,* was expressly limited to its facts. Said the court: "We limit our holding to the facts presented, and of course do not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." (*Id.,* at p. 321 [96 L.Ed.2d at p. 268].) The Supreme Court then remanded the case to the California Supreme Court for further proceedings on the question of whether there had been an unconstitutional taking under the ordinance there in question.

Neither is it " 'clear beyond peradventure . . .' " that the Growth Management Ordinance would result in such excessive delay that it can be assumed that all of the property's beneficial uses have presently been destroyed. (See *Kinzli* v. *City of Santa Cruz, supra,* 818 F.2d at p. 1454, fn. 5, citing *Norco Construction, Inc.* v. *King County* (9th Cir. 1986) 801 F.2d 1143, 1145.) The instant temporary ordinance calls for a reevaluation in 1991 of its restrictions, pursuant to the 1990 census and it automatically expires in 1996. ■ Unless a temporary moratorium is total and is unreasonable in purpose, duration or scope, the restrictions it places on development are not compensable. (*First English II, supra,* 210 Cal.App.3d at pp. 1372-1373.)

In *First English II, supra,* the county enacted a temporary moratorium on building after a flood so that it could conduct a study of the situation. This

did not constitute an unconstitutional taking. No taking results when a partial moratorium measure is enacted to protect the public health, safety or morals. (210 Cal.App.3d at p. 1362; see also *Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582.)

### *Loss of Substantially All Economic Use*

■ The second prong of the *Agins* taking test is whether the regulations deny the property owner substantially all economically viable use of the land. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [65 L.Ed.2d at pp. 111-112].) The meaning of this concept is elusive, but the general rule is that "the existence of permissible uses determines whether a development restriction denies a property holder the economically viable use of its property." (*Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at p. 877, citing cases.)

The denial of the highest and best use does not constitute an unconstitutional taking of the property. (*MacLeod* v. *Santa Clara County, supra,* 749 F.2d at p. 548.) Even where there is a very substantial diminution in the value of land, there is no taking. (*Id.,* at pp. 547-548, citing *Hadacheck* v. *Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143]—diminution in value from $800,000 to $60,000 not a taking; *William C. Haas* v. *City & Cty. of San Francisco* (9th Cir. 1979) 605 F.2d 1117, 1120—diminution in value from $2 million to $100,000 not a taking.) The burden of proof is on the applicant, who faces an uphill battle. (*Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at p. 877.)

In *MacLeod* v. *Santa Clara County, supra,* 749 F.2d 541, MacLeod purchased cattle grazing property and found it unprofitable. At one time the county granted him a use permit to harvest hardwood, which he also found to be unprofitable. Then, MacLeod attempted to farm the land, which he found infeasible due to irrigation problems.

He then successfully applied to the state for permission to harvest timber. He entered into a contract to sell harvested timber to a third party. County, citing various public health, safety and welfare concerns, denied him a use permit. MacLeod sued for inverse condemnation.

The court, ruling for the county, found that the denial of the permit application did not interfere with other primary objectives: (1) holding the property for investment purposes, and (2) cattle grazing. (*MacLeod* v. *Santa Clara County, supra,* 749 F.2d at p. 547.)

In *William C. Haas* v. *City & Cty. of San Francisco, supra,* 605 F.2d 1117, the appellant claimed that rezoning and imposition of other land use

restrictions so diminished the value of his investment property that it amounted to a taking. The court disagreed.

On June 28, 1971, Haas contracted to purchase a large unimproved parcel of land in San Francisco. The contract was conditioned on the procurement of a valid site permit for his proposed high-rise development project.

As of July 7, 1971, the date of application for the permit, the property was zoned for the proposed use. Nonetheless, the planning commission denied the permit because the project "would have a detrimental effect on the City as a whole and upon the residents and property of the neighborhood." (*William C. Haas* v. *City & Cty. of San Francisco, supra*, 605 F.2d at p. 1119.) The city relied on a recent urban design plan developed for inclusion in the city's master plan.

Haas appealed on August 13, 1971. Two weeks later the commission formally adopted the urban design plan. On August 26, 1971, interim height and bulk restrictions were adopted by the commission, and Haas withdrew the application.

On November 9, 1971, Haas submitted a new plan to the commission to comply with the new height and bulk limitations. The commission approved the application for a site permit on the revised plans, and the board of permit appeals denied a petition for rehearing sought by surrounding residents. Haas then bought the land for $1,650,000, plus various fees. He broke ground and commenced construction.

A neighborhood improvement association filed a writ petition on April 20, 1972, on the ground that Haas failed to comply with the California Environmental Quality Acts of 1970 and 1972. Although he prevailed in the trial court, Haas lost on all appeals. The courts held that he did not state a sufficient claim for a vested right despite the site permit, because he had not undertaken "substantial construction" nor had he incurred substantial liabilities. Haas had to start anew.

By then, however, Haas faced "insurmountable barriers" to the proposed project because the planning commission had adopted a 40-foot height restriction, density controls and had rezoned the property. Haas sued to challenge the rezoning and other land use restrictions on constitutional grounds. He contended that the combined impact of these restrictions destroyed the value of his property investment.

The court held that, as a matter of law, he stated no claim for inverse condemnation. His numerous contentions all rested on the premise that the

rezoning and the land use restrictions were so grossly disproportionate in their detriment to him, as opposed to the benefits conceivably inured to the public's general welfare, that they constituted a taking. (*William C. Haas* v. *City & Cty. of San Francisco, supra,* 605 F.2d at p. 1120.)

The *Haas* court upheld the land use regulations because they were reasonably related to health, safety, morals or general welfare. Such police power regulations are routinely upheld even when they nearly destroy or severely affect recognized real property interests or flatly prohibit the most beneficial use. (*William C. Haas* v. *City & Cty. of San Francisco, supra,* 605 F.2d at p. 1120.) Although the standard of reasonable relation is lower than that set forth recently by the Supreme Court in *Agins* and *Nollan,* the purposes of a comprehensive plan to decrease population density, to preserve natural resources, and to promote aesthetics are sufficient to support the restrictions which have been enacted here as a matter of law. (*Id.,* at pp. 1120-1121.)

LBE, like Haas, argued it was left with no economically viable use. Even if it were true that LBE's profit may be severely reduced, it would fail to meet the test that there be no viable economic use of the property. This rule holds true even if the zoning restrictions preclude recovery of the initial investment made. (*William C. Haas* v. *City & Cty. of San Francisco, supra,* 605 F.2d at pp. 1120-1121.)

The restrictions in the Growth Management Ordinance and the openspace zoning designations do not rule out development upon annexation. Although County has downzoned most of the subject property to OS-160 (openspace designation permitting one residential structure per 160 acres of land), LBE may apply for a zoning change for permissible 10-acre parcels. (And see *Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at p. 877—government entities need not show the availability of such uses.)

The possibility of obtaining a zoning change or applying for other additional special uses strongly suggests there are other economically beneficial uses not expressly included in such ordinances. (*Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at p. 877.)

*Reasonable Investment-backed Expectations*

LBE opines that its reasonable investment-backed expectations (RIBE), to profitably build out a subdivision of homes, has been rendered economically infeasible because of delays caused by the laws and the conduct of defendants.

There is considerable controversy whether courts should consider a landowner's profit expectations in an inverse condemnation action. (See *Lake Nacimiento Ranch Co.* v. *San Luis Obispo Cty., supra,* 841 F.2d at pp. 877-878, esp. fn. 4, citing *Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 190-191, fn. 12 [87 L.Ed.2d at p. 142]; and cf. *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 499 [94 L.Ed.2d 472, 497, 107 S.Ct. 1232].)

Although in some cases it may be a legitimate consideration, here LBE has not stated facts which enable it to proceed on this theory.

Although the developer in *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d 785, spent more than $2 million in building infrastructure and had obtained a final map as well as a permit to complete rough grading, the court concluded that its failure to obtain a permit from the coastal commission and obtain final building permits left it without a vested interest upon which it could rely. (P. 793.)

The court so held even though it found that the approvals Avco had previously received led Avco to reasonably expect it would be allowed to build without further discretionary approvals. (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 790.) Under *Avco,* one cannot obtain a vested right to build in reliance on "the assurances of city officials that construction . . . was permitted, . . ." or on spending large sums for preliminary development costs. (*Id.,* at pp. 792-793.)

In *MacDonald, Sommer & Frates* v. *County of Yolo, supra,* 477 U.S. at page 349 [91 L.Ed.2d at pp. 294-295], the Supreme Court stated that until the landowner has obtained a final decision regarding the application of zoning and subdivision regulations to his property, it is impossible to know whether the land retains any reasonable beneficial use *or whether his reasonable investment-backed expectations have been destroyed.* LBE has not submitted an application for annexation, much less applied for and obtained an actual building permit. (See also *Agins* v. *Tiburon, supra,* 447 U.S. at p. 262 [65 L.Ed.2d at pp. 112-113].)

In *MacLeod* v. *Santa Clara County, supra,* 749 F.2d 541, the concept of RIBE is discussed in conjunction with the *Agins* prongs of vested rights and economic viability. As to the vested rights theory, the court said that although MacLeod had every reason to believe his application (for a county use permit to harvest timber) would be granted, he "must have been aware

that the standards and conditions governing the issuance of the permit might cause his application to be denied." (*Id.*, at p. 548.)

On the theory of economic viability, the court said that denial of the permit did not interfere either with holding the property for investment purposes or with the interim, although unprofitable, use of cattle grazing. (*MacLeod v. Santa Clara County, supra,* 749 F.2d at pp. 546-548.) Diminution in expected value, even if that loss is severe, does not constitute a taking. (*Id.*, at p. 548, citing *Hadacheck v. Sebastian, supra,* 239 U.S. 394—$800,000 investment became worth $60,000; and *William C. Haas v. City & Cty. of San Francisco, supra,* 605 F.2d at p. 1120—$2 million investment became worth $100,000.)

As here, the gravamen of MacLeod's contention was that a taking requiring compensation occurred "because he has been denied the opportunity to exploit his property by pursuing a particular project he had come to believe would be available for development. This argument fails." (*MacLeod v. Santa Clara County, supra,* 749 F.2d at p. 548; see especially *William C. Haas v. City & Cty. of San Francisco, supra,* 605 F.2d at pp. 1120-1121; and also *MacDonald, Sommer & Frates v. County of Yolo, supra,* 477 U.S. at p. 347 [91 L.Ed.2d at p. 293].)

" '[The] [p]rediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform . . . .' " (*MacLeod v. Santa Clara County, supra,* 749 F.2d at p. 548, quoting *Andrus v. Allard* (1979) 444 U.S. 51, 66 [62 L.Ed.2d 210, 223, 100 S.Ct. 318]; and see *Hodel v. Virginia Surface Mining & Recl. Assn., supra,* 452 U.S. at pp. 296-297 [69 L.Ed.2d at pp. 28-29].) Since *Penn Central Transp. Co. v. New York City, supra,* 438 U.S. 104, the Supreme Court has rejected such arguments as " 'quite simply untenable.' " (*MacLeod, supra,* at p. 548, quoting *Penn Central, supra,* at p. 130 [57 L.Ed.2d at p. 652].) The Fifth Amendment "is not a panacea for less-than-perfect investment or business opportunities." (*Id.*, at p. 549.)

Regardless of how we analyze RIBE, we come up with the same conclusion—LBE has not stated facts which support recovery for inverse condemnation as a matter of law.

*Due Process*

 LBE's due process allegations are conclusional and premature. (*Kinzli v. City of Santa Cruz, supra,* 818 F.2d at p. 1456, citing the Supreme Court in *Williamson Planning Comm'n v. Hamilton Bank, supra,* 473 U.S. at p. 199 [87 L.Ed.2d at pp. 146-147].)

Even if a Fifth Amendment takings claim could arguably be recast as one sounding in substantive due process, it would be premature. (*Kinzli v. City of Santa Cruz, supra,* 818 F.2d at p. 1456.) And, there can be no denial of procedural due process, under the Fourteenth Amendment, until the substantive due process claim is ripe. (*Ibid.*)

An ordinance that is reasonably related to the public welfare of the population it significantly affects is constitutional. (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d at pp. 606-607; also see *McMillan* v. *Goleta Water Dist.* (9th Cir. 1986) 792 F.2d 1453, 1457.) The Guidelines and the Growth Management Ordinance are reasonably related to the public welfare.

### Equal Protection

LBE alleges that defendants have arbitrarily set aside its property as open space, whereas comparable property in the County has not been similarly restricted.

Absent the allegation of the invasion of fundamental rights or the existence of a suspect classification, there is no violation of equal protection unless the classification bears no rational relationship to a legitimate state interest. (*McMillan* v. *Goleta Water Dist., supra,* 792 F.2d at p. 1456; *Pennell* v. *San Jose* (1988) 485 U.S. 1, 14 [99 L.Ed.2d 1, 15-16, 108 S.Ct. 849], citing *Vance* v. *Bradley* (1979) 440 U.S. 93 [59 L.Ed.2d 171, 99 S.Ct. 939].) This is true even if some discrimination is alleged. (*McMillan, supra,* at p. 1456.)

As with the due process cause of action, the claim here is not ripe. LBE's second amended complaint, proffered as a motion for reconsideration, provided more specific allegations concerning owners of other property who have allegedly been treated more equitably. Even if the trial court had allowed the second amended complaint to be filed, it would still be subject to demurrer absent LBE's filing a proper application.

### Civil Rights

LBE's allegation that it has been deprived of due process, equal protection and just compensation in inverse condemnation under color of state law, pursuant to title 42 United States Code sections 1983 and 1988, is not ripe because there has been no final decision on meaningful applications. (See *Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 187-188 [91 L.Ed.2d at pp. 139-140].)

*Conspiracy*

 LBE alleges a conspiracy among the defendants to perform the activities previously alleged. There is no separate cause of action for civil conspiracy apart from overt acts done in furtherance of activities which are legally compensable. (*Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464]; and see *Escamilla* v. *City of Santa Ana* (C.D.Cal. 1985) 606 F.Supp. 928, regarding 42 U.S.C. § 1983 allegations.) Because we find LBE has not alleged any actionable activities, we hold that there is no actionable conspiracy.

*Relief by Writ, Injunction and Declaratory Relief*

Because there is no basis in law or equity to grant relief under the facts alleged, there is no ground upon which we can grant relief by way of writ, injunction or declaration.

LBE has sued City and County because of disappointed expectations concerning its development plans. LBE states no cause of action even if it has expended substantial sums on infrastructure and preapproval planning, and even though there will be some delay in bringing some development proposal to fruition. These expenditures and delays are the normal incidents of development projects and are not actionable, per se.

We affirm the judgment as to County.

As to City's petition, let a writ of mandate issue to compel the trial court to enter a new and different order sustaining City's demurrer in its entirety without leave to amend. Costs to City and County.

Yegan, J., and Abbe, J.,* concurred.

A petition for a rehearing was denied July 25, 1991, and appellant's petition for review by the Supreme Court was denied September 26, 1991.

---

*Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.