Morton P. MacLEOD,
Plaintiff-Appellant,

v.

COUNTY OF SANTA CLARA,
Defendant-Appellee.

No. 83–2480.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 1984.

Decided Dec. 10, 1984.

Robert M. Westberg, Vaughn R. Walker, John M. Grenfell, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff-appellant.

Robert J. Menifee, Deputy County Counsel, San Jose, Cal., for defendant-appellee.

Before FARRIS, ALARCON, and NORRIS, Circuit Judges.

ALARCON, Circuit Judge:

Morton P. MacLeod (hereinafter MacLeod) appeals from the judgment in favor of Santa Clara County (hereinafter the County) holding that the County's denial of his application for a permit to harvest timber on his property did not constitute a compensable taking. MacLeod contends that the district court erred in holding that the denial of a permit to harvest timber did not effect a "taking" of his property for a public use, within the meaning of the fifth amendment, requiring just compensation.[1]

## FACTS

Appellant MacLeod is the successor in interest to, and the former president and director of, the Castro-Escondido Ranch Corporation (hereinafter the Ranch Corporation). In June of 1974, while MacLeod was serving as its president, Triad Capital Management Holding Company (hereinafter Triad) formed the Ranch Corporation for the purpose of purchasing and holding title to the Castro-Valley and Escondido Ranches. MacLeod was responsible for the purchase of the property, which was offered for sale as a single parcel consisting of approximately 7,000 acres.

The Escondido Ranch, which contains about 1,800 acres, is primarily a mountainous woodland. The Castro-Valley Ranch, which contains about 5,200 acres, is primarily covered by a mountain range and wood-

---

1. The fifth amendment is made applicable to the States through the fourteenth amendment, *see Chicago, B. & O.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897). We note jurisdiction under 28 U.S.C. § 1291 (1983).

land, with many sections of open grazing land. An enclosed valley of approximately 150 acres of relatively flat land, known as the Castro-Valley, gives that ranch its name. The entire property is located within the A1 Residential and Agricultural zoning district of Santa Clara County. MacLeod, anticipating a significant increase in value, purchased the property on behalf of the Ranch Corporation for $2,700,000 as a long-term investment, with interim use as a cattle ranch.

In December of 1976, MacLeod's association with Triad was involuntarily terminated. On January 1, 1977, in exchange for his stock in the parent company and other consideration, MacLeod received 100% of the Ranch Corporation's stock.[2] MacLeod's stock in Triad was deemed to be worth the sum of the down payment on the property ($800,000) and the two-year carrying costs ($640,000). Thus, MacLeod's "investment" in the Castro-Escondido property was $1,400,000. He assumed the outstanding mortgage of $1,700,000.[3]

MacLeod continued the historic use of the property, by leasing it out in its entirety for cattle grazing during the first years of ownership. In 1977, MacLeod purchased approximately 150 cow-calf units in an effort to run his own cattle operation on the Castro-Escondido property. In 1978 and 1979, MacLeod again leased out the entire property for cattle grazing. Neither activity proved sufficient to cover the costs of maintaining the property. In October of 1977, MacLeod obtained a permit from the County to harvest hardwood. The harvest was conducted in 1978–1979, but proved unprofitable as well. In 1978, MacLeod attempted an experimental farming operation on the 150 acre valley in the Castro-Valley parcel. Water problems led to the abandonment of this project. MacLeod then began to pursue the possibility of large-scale timber harvesting.

MacLeod employed the firm of Hammon, Jensen, Wallen, and Associates, professional foresters, to prepare an inventory of the property and a timber harvest plan (hereinafter the Plan). The resulting plan involved the selective harvesting of a maximum of 2.5 million board feet of timber. Pursuant to the California Z'berg-Nejedly Forest Practice Act of 1973, Cal.Pub.Res. Code § 4511 *et seq.*, MacLeod submitted this Plan to the State Department of Forestry. After inspecting the property, the State Department of Forestry approved the Plan.

MacLeod subsequently entered into an agreement with Big Creek Lumber Company (hereinafter Big Creek) whereby MacLeod agreed to sell, and Big Creek agreed to harvest, 2.5 million board feet of redwood timber. Under the terms of the contract, MacLeod was to receive a fixed price of $325 per thousand board fee of redwood timber.

The timber sale agreement was conditioned on the obtaining of a use permit from the County that was satisfactory to Big Creek. MacLeod applied for a permit in September of 1978. The planning commission conducted a hearing on MacLeod's application in September of 1979. The application was denied for public health, safety, and welfare reasons.

MacLeod appealed the denial to the County Board of Supervisors. That body held a de novo hearing on the application.

**2.** MacLeod received the Ranch Corporation stock rather than cash or some other asset because Triad determined that MacLeod should be the one to "live with" his investment decision.

**3.** In early 1978, the name of the Ranch Corporation was changed to the Bloomfield-Hereford Corporation because MacLeod, on behalf of the Ranch Corporation, purchased the Bloomfield-Hereford Ranch, which was contiguous to the Castro-Escondido property. The district court found that because the Bloomfield Ranch was acquired separately, zoned differently, and had an overall topography different from that of the Castro-Escondido Ranch, MacLeod's ownership of the Bloomfield Ranch would be considered somewhat a "fortuity," and, for purposes of the taking analysis, only the Castro Valley and Escondido ranches would constitute the property at issue. Since MacLeod does not challenge this particular finding, we need not address it here. But hereafter, all references to the ranch property refer to the Castro-Escondido property only unless otherwise noted.

The denial of the permit was upheld. MacLeod then filed a complaint in the Superior Court in California seeking to set aside the determination of the Board. The Santa Clara County Superior Court entered judgment for the County. MacLeod then sought expedited review before a California appellate court by writ of mandate.[4] In an opinion issued December 29, 1981, the California Court of Appeal denied the writ, effectively affirming the judgment. MacLeod's petition for a hearing in the California Supreme Court was denied on March 11, 1982.

Shortly thereafter, MacLeod filed this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983 seeking compensation for the alleged "taking" of his property by the County in violation of the fifth and fourteenth amendments. After a trial, the district court entered judgment for the County. The district court found that although MacLeod had a right to an economically viable use of his property, such use did not exist. The court held that the property in question would not have been sufficiently profitable, even if the permit to harvest timber had been granted, for the denial of the permit to constitute a taking.

We do not agree with the district court's reliance on immediate overall profitability as the standard for determining whether a compensable taking has occurred. We agree, however, that no taking has occurred on the facts of this case, and affirm the judgment for the reasons stated below.

## DISCUSSION

### I

▉ The fifth amendment guarantees that private property shall not "be taken for public use, without just compensation."

Traditionally, a compensable "taking" was deemed to occur whenever a government agency or entity formally condemned a landowner's property and obtained the fee simple pursuant to eminent domain proceedings. Cf. United States v. Clarke, 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980) (distinguishing traditional condemnation and eminent domain proceedings from modern takings); Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (comparing the two methods of taking—compelling surrender or physical invasion vs. restriction of use or rights in private property); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Under present law, a taking can also occur, without the filing of condemnation proceedings, whenever government action beneficial to the public results in the destruction or restriction of the use and general enjoyment of privately owned real property. See, e.g., Kaiser Aetna v. United States, 444 U.S. 164, 178–180, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) (navigational servitude allowing public right of access); United States v. Causby, 328 U.S. 256, 261–62, 66 S.Ct. 1062, 1065–66, 90 L.Ed. 1206 (1946) (frequent low altitude flights of Army and Navy aircraft over a chicken farm). The rationale for expanding the traditional notion of "taking" is relatively simple: "Police power regulations such as zoning ordinances and other land use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J. dissenting).[5]

---

4. In the meantime, MacLeod sold the ranches. The Bloomfield-Hereford Ranch Corporation entered into an agreement to sell the entire property to the C.M. Trading Company for $7,201,524. The Bloomfield-Hereford Ranch Corporation was dissolved in April of 1980, but MacLeod personally assumed its assets and liabilities.

5. The cause of action alleged in such an instance is inverse condemnation. The term "inverse condemnation" simply refers to "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." Clarke, supra 445 U.S. at 257, 100 S.Ct. at 1130. An action for inverse condemnation is cognizable under 42 U.S.C. § 1983. See Lake Country Estates v. Tahoe Planning Agency,

Although it is now well established that government regulations *can* effect a fifth amendment taking, *see, e.g., Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (no taking found on the facts of the case); *In re Aircrash in Bali Indonesia on April 22, 1974,* 684 F.2d 1301, 1312 (9th Cir.1982), we cannot agree with MacLeod's contention that the denial of the permit operated to effect a taking of property in this instance. No set formula has been developed for determining when "justice and fairness" require that economic injuries caused by government regulations for the good of the general public must be compensated by the government rather than left to remain disproportionately concentrated on a few individuals. *See, e.g., Andrus, supra* 444 U.S. at 65, 100 S.Ct. at 326. Instead, the question of whether or not a particular restriction effects a taking depends largely upon the particular circumstances of the case. *See Penn Central, supra* 438 U.S. at 124, 98 S.Ct. at 2659. The law is well settled, however, that the application of a general zoning law to particular property effects a taking if "the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land ...." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), *citing Penn Central, supra.* If a regulation or prohibition is a valid exercise of the police power, there is no taking if economically viable use of the property remains.

## II

The phrase "economically viable use" became an important part of taking jurisprudence after the Supreme Court decision in *Penn Central, supra. Penn Central* involved the application of New York City's Landmark Preservation Law to Grand Central Terminal (hereinafter the Terminal). The Terminal, owned by Penn Central Transportation Company and its affiliates (hereinafter Penn Central), is one of New York City's most famous buildings, and as such, had been designated a landmark.

To increase its income, Penn Central entered into a renewable 50-year lease and sublease agreement with UGP Properties, Inc. (hereinafter UGP). Under the terms of the agreement, UGP was to construct a multi-story office building above the Terminal. UGP and Penn Central then applied to the Landmarks Preservation Commission (hereinafter the Commission) for permission to construct the proposed office building atop the Terminal. Permission was denied on the ground that the proposed tower would overwhelm the existing building, destroy its aesthetic appeal, and reduce the designated landmark to the status of a curiosity. *Id.* 438 U.S. at 118, 98 S.Ct. at 2656.

Rather than seek review of the denial of the certificate of construction, appellants filed suit in New York State Court claiming that the application of the Landmark Law had "taken" their property without just compensation in violation of the fifth amendment, and arbitrarily deprived them of their property without due process of law in violation of the fourteenth amendment. The New York Court of Appeals summarily rejected any claim that the Landmark Law had taken appellant's property without just compensation.

In affirming the New York Court of Appeals, the Supreme Court used a two-step analysis, deciding first whether the Landmark Law was constitutional, and second, whether it so interfered with appellant's property as to require compensation. In deciding that the law was a constitutional exercise of the police power, the Court noted that use prohibitions or restrictions are unconstitutional takings if the government action in issue cannot be characterized as an acquisition of resources to permit or facilitate uniquely public functions, *see United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), if the regulation in issue is not reasonably necessary to effectuate a substantial public pur-

pose, or if the government regulation or action so frustrates the distinct investment-backed expectations of the claimant as to have nearly the same effect as the complete destruction of the claimant's rights, *see Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (government's complete destruction of a materialmen's lien in certain property held a "taking"); *Pennsylvania Coal Co. v. Mahon, supra. Penn Central, supra* 438 U.S. at 127–28, 98 S.Ct. at 2660–61. The Court quickly disposed of Penn Central's contentions that the law amounted to discriminatory zoning, or was arbitrary because it was basically a matter of taste. *Id.* at 132, 98 S.Ct. at 2663. It rejected the argument that the law unfairly distributed the benefits and burdens of governmental action by not imposing identical restrictions on all structures located within a particular community, holding that the imbalanced distribution of the benefits and burdens resulting from such an ordinance did not mean that the law effected a taking. *Id.* at 133, 98 S.Ct. at 2663. It also held that the fact that a regulation had the effect of denying the owner the ability to exploit a property right that was heretofore believed available, or diminishing the value of the property did not prove that such regulation amounted to a taking. *Id.* at 130–31, 98 S.Ct. at 2662–63. Finally, the Court rejected Penn Central's challenge to the law's constitutionality by holding that the law had not operated to appropriate part of the property for strictly governmental purposes. *Id.* at 135, 98 S.Ct. at 2665. Thus, it held that although the New York City Landmark Law restricted the exploitation of a property interest to a greater extent than applicable general zoning law, it was not unconstitutional. *Id.* at 135–36, 98 S.Ct. 2664–65.

The Court then went on to consider the severity of the impact of the law on Penn Central's property. After a careful assessment of the impact of the regulation on the terminal site, the Court found that the Landmark Law did not interfere in any way with the present uses of the terminal:

> Its designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal .... So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel.

*Id.* at 136, 98 S.Ct. at 2665. The Court also found that the law permitted Penn to obtain a "reasonable return" on its investment. *Id.* at 136, 98 S.Ct. at 2665. The Court concluded that the law permitted a "reasonable beneficial use" of the landmark site, and thus held that it had not effected a taking of Penn's property. *Id.* at 138, 98 S.Ct. at 2666.[6]

### III

MacLeod contends that the denial of the permit operated to deny him economically viable use of his property. We cannot agree. The issue of whether the denial of the permit was a legitimate exercise of the County's police power was decided by the California State Courts in favor of the County. MacLeod has not pursued that question before this court. Therefore, our review is limited to the issue of whether the rejection of the application denied MacLeod the economically viable use of his property.

■ Any analysis of whether a regulation or prohibition denied an owner the economically viable use of his property necessitates a review of the impact of the regulation or prohibition on the property as a whole. *See Penn Central, supra* at 130, 98 S.Ct. at 2662. In *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), appellant challenged a city ordinance that completely prohibited a beneficial use to which the property had previously been devoted by prohibiting fur-

---

**6.** The Court refers to the importance of this economically viable use in footnote 36 on this same page.

ther excavation on 20 acres of their 38 acre lot. In holding that the ordinance was a valid exercise of the police power, the Court took into consideration the availability of the remaining 18 acres of land in determining that the ordinance was neither so onerous or unreasonable as to result in a taking of appellant's property. *Id.* In *Gorieb v. Fox*, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927), the challenged ordinance created a setback or building line to which all buildings subsequently erected had to conform. The appellant owned several building lots within the area covered by the ordinance. He applied to the city council for a permit to erect a brick building upon a lot within the ordinance area, and the council gave him permission to erect a building 34⅔ feet back from the street line. He thereupon sought to compel the council to issue a permit to occupy the lot up to the street line, alleging that the setback ordinance deprived him of his property without due process of law. The Court sustained the setback ordinance as reasonable and constitutional, holding that the restriction was not so substantial as to amount to a taking of appellant's property.

■ Thus, it is well settled that taking jurisprudence does not divide a single parcel into discrete segments or attempt to determine whether rights in a particular segment of a larger parcel have been entirely abrogated. The Supreme Court has long since rejected any contention that denial of the use of a portion of a parcel of property is so bound up with the investment-backed expectations of a claimant that government deprivation of the right to use a portion of the property in issue invariably constitutes a taking, irrespective of the impact of the restriction on the value of the parcel as a whole. *Penn Central, supra* 438 U.S. at 130, n. 27, 98 S.Ct. at 2662, n. 27. In deciding whether a particular governmental action has effected a taking, the Court must focus both on the character of the action and on the nature and extent of the interference with the rights in the parcel as a whole. *Id.* at 130–31, 98 S.Ct. at 2662–63.

■ The denial of the permit, unlike the government acts in *Causby, supra,* did not interfere in any way with the two present and primary uses of the property. Specifically, the denial of the permit did not affect MacLeod's ability to continue to hold the property for investment purposes, with interim use as a cattle ranch, and grazing land, the very uses for which the property was purchased. It is an undisputed fact that MacLeod was free to continue to raise cattle or to lease out the property for grazing lands, and retained the right to continue to hold the property as an investment.[7] Thus, it is clear that the denial of the permit did not interfere with MacLeod's primary "investment-backed expectation" concerning the use of the parcel. *See Penn Central, supra* at 136, 98 S.Ct. at 2665.

■ MacLeod would have us disregard the fact that the denial of the permit did not affect his expected uses of the Ranch property because he eventually found out that these uses were not the most profitable or the highest and best use of the property. It is undeniable that rejection of the permit kept MacLeod from pursuing what may have been the most profitable

---

7. Holding property for investment purposes can be a "use" of property. *See, e.g., Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (a suit brought by an owner of unimproved land that was vacant and had been held for years for the purpose of sale and development for industrial use, seeking relief from the enforcement of a zoning ordinance on the grounds that the ordinance operated to reduce the normal value of his property, and to deprive him of liberty and property without due process of law. The ordinance was held to be a valid exercise of the police power. The validity of the owner's "uses" was never questioned); *United States v. 156.81 Acres of Land,* 671 F.2d 336, 337 (1982), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 569, 74 L.Ed.2d 931 (1982) (where appellants owned roughly 156.81 acres of undeveloped land in Marin County, California which was undisputedly not income producing, but had been purchased and was being held for its "development potential." A condemnation judgment which denied the economically viable use of the property was nevertheless held to be a taking requiring just compensation).

short term use of the property, i.e. large scale timber harvesting. The fact that the denial of the permit prevented MacLeod from pursuing the highest and best use of his property does not mean that it constituted a taking.

In addition, appellant's "highest and best use" argument is simply another way of claiming that he has suffered a diminution in the value of his property rather than the complete destruction of its economically viable use. The Supreme Court has repeatedly held that mere diminution in value, standing alone, cannot establish a taking. *See Penn Central, supra* at 131, 98 S.Ct. at 2663; *Euclid, supra* (75% diminution in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (value reduced from $800,000 to $60,-000). *See also William C. Haas & Co. v. City & County of San Francisco,* 605 F.2d 1117, 1120, (9th Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980) (value reduced from $2,000,000 to $100,000).

Moreover, the timber sale agreement with Big Creek was contingent upon MacLeod obtaining all necessary permits. Although at the time MacLeod applied for the permit he had every reason to believe that his application would be granted, he must have been aware that the standards and conditions governing the issuance of the permit might cause his application to be denied. Thus, MacLeod had an expectation, but not an assurance that the permit would issue. In essence, MacLeod is contending that there has been a taking requiring compensation because he has been denied the opportunity to exploit his property by pursuing a particular project he had come to believe would be available for development. This argument fails. In *Penn Central, supra,* the Supreme Court rejected as "quite simply untenable" the contention that property owners "may establish a taking simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development ...." *Id.* 438 U.S. at 130, 98 S.Ct. at 2662.

MacLeod finally argues that the district court erred in holding that the denial of the permit was not a taking because the timber harvesting operation would not have produced a profit over and above the overall expenses of the entire ranch operation. He asserts that the standard to be applied in the determination of "economic viability" does not depend on the overall profitability (ability to generate income sufficient to cover expenses and carrying costs), of the property or business in issue. We agree. Although the Supreme Court has never elaborated on the meaning of "economically viable," *Penn Central, supra* linked its use of the term to "the ability to use the property *for its intended purpose* in a gainful fashion." *Id.* at 138, n. 36, 98 S.Ct. at 2666 n. 36 (emphasis added). Further, the Supreme Court has stated with respect to a "lost future profits" based taking claim, that: "Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Andrus v. Allard, supra* 444 U.S. at 66, 100 S.Ct. at 327.

We are unwilling to equate immediate overall profitability with the requirement of "economic viability." To do so would be a major departure from the prior jurisprudence in this area. We perceive nothing in the language of *Agins, supra,* or *Penn Central, supra,* that would in any way cast doubt on our analysis. It was thus error for the district court to consider the immediate overall profitability as the measure of whether or not there had been a taking of appellant MacLeod's ranch property. This error was neither dispositive nor prejudicial, however, in light of MacLeod's inability to prove that the denial of the permit had indeed operated to effect a taking of his property. It is clear from the record that the denial of the permit in no way affected MacLeod's ability to continue to use the property for "its original intended

uses." *See Penn Central, supra* 438 U.S. at 138, n. 36, 98 S.Ct. at 2666 n. 36. His assertion that the denial of the permit effectively extinguished an expected opportunity for exploitation of his property, thereby preventing him from pursuing the highest and best use of his property, is not enough to establish a taking. *See Penn Central, supra.*

## CONCLUSION

In sum, existing authority compels us to reject MacLeod's contention that the denial of the right to use a portion of a parcel of property invariably constitutes a taking, irrespective diminution of value, or denial of the highest and best use of property can constitute a taking have each been rejected by the Supreme Court. The determination of whether or not an economically viable use of property remains is essentially an ad hoc factual inquiry. *Penn Central, supra* at 124, 98 S.Ct. at 2659. That decision turns upon the economic impact of the regulation and, particularly, the extent to which the regulation or prohibition has interfered with the distinct investment-backed expectations of the claimant. *Id.* The denial of the permit to harvest timber merely prohibited an additional expected use of the property. This is not enough to allow us to conclude that it interfered with MacLeod's investment-backed expectations, extinguished a fundamental attribute of ownership, or prevented MacLeod from deriving a reasonable return on the property.

We are not insensitive to the fact that the denial of the permit may have placed MacLeod in a difficult short term financial situation. But the fifth amendment is not a panacea for less-than-perfect investment or business opportunities. It cannot be said that the denial of the permit denied

MacLeod the " 'justice and fairness' guaranteed by the Fifth ... Amendment ...." *Agins, supra.* We therefore conclude that no taking occurred.[8]

Accordingly, the opinion of the district court is AFFIRMED.

---

8. We are aware of the recent Sixth Circuit decision in *Hamilton Bank of Johnson City v. Williamson County*, 729 F.2d 402 (6th Cir.1984). The Supreme Court has recently granted certiorari in that case. We do not find *Hamilton Bank* dispositive of the question before us. The *Hamilton Bank* Court held that the evidence supported a finding that the property in question had *no* remaining economically viable use after the zoning ordinance was instituted. This

was not the case with MacLeod's ranch property. Further, to the extent that the *Hamilton Bank* Court relies on the notion that diminution in value is a significant interference with investment-backed expectations amounting to a taking, *id.* at 407, it is contrary to the law of this circuit. *William C. Haas & Co. v. City & County of San Francisco*, 605 F.2d 1117, 1120 (9th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980).