# United States Court of Appeals for the Fifth Circuit

—————————

No. 23-20385

—————————

United States Court of Appeals
Fifth Circuit

**FILED**
August 12, 2025

Lyle W. Cayce
Clerk

DM Arbor Court, Limited,

*Plaintiff—Appellant*,

*versus*

The City of Houston, Texas,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-1884

———————————————————————

Before Dennis, Willett, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

After Hurricane Harvey flooded the Arbor Court apartment complex in 2017, the City of Houston denied the owners a repair permit by invoking a rarely used provision in the city flood control ordinance. The owners sued, arguing that the City's permit denial amounted to an unconstitutional taking of the multi-million dollar property under the Fifth Amendment. Following a bench trial, the district court ruled against the owners, concluding that, despite the permit denial, the property still had economic life.

No. 23-20385

We reverse and remand. Based on the undisputed evidence, we conclude that the City's regulatory action deprived Arbor Court's owners of all economically viable use of the property. The City therefore effected a categorical taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). The district court legally erred by ruling otherwise.

Accordingly, we REVERSE the district court's judgment and REMAND for further proceedings.

I

A

Arbor Court is a 15-building, 232-unit, multifamily apartment complex in Houston, Texas. Appellants DM Arbor Court, Limited (DMAC), purchased the complex for $11.85 million in January 2016. Since then, DMAC has operated Arbor Court under a Housing Assistance Payment Contract ("HAP Contract") from the U.S. Department of Housing and Urban Development (HUD). Under that contract, DMAC provides subsidized housing to low-income residents.

Arbor Court lies in a 100-year floodplain. A city flood ordinance ("Chapter 19") requires such structures to be elevated above the minimum flood protection elevation. HOUSTON, TEX., CODE OF ORDINANCES § 19-33(a)(1). For an existing structure like Arbor Court, that requirement applies only if it has undergone "substantial improvement." *See id.*[1] This occurs, for example, when a structure incurs "substantial damage," such that repair costs "would equal or exceed 50 percent of the market value of the structure." *Id.* § 19-2.

---

[1] Unlike an "existing" structure, all "new construction" in a floodplain must comply with Chapter 19's elevation requirements. *See id.* §§ 19-32, 19-33(a).

No. 23-20385

In April 2016, Arbor Court flooded. DMAC sought and received permits to make repairs without elevating any buildings. Later in 2016, after making those repairs, DMAC renewed its HAP Contract for twenty years. DMAC then spent another $1.4 million on improvements, resulting in Arbor Court's being appraised at over $21 million.

In August 2017, Hurricane Harvey hit Houston. Arbor Court again flooded, taking on three to four feet of water, and tenants evacuated. In September 2017, DMAC again applied for permits to repair the damages.

This time the permits were denied. On October 6, 2017, the City informed DMAC that all 15 Arbor Court buildings had "substantial damage"—meaning no permit would issue until all buildings were elevated. In January 2018, DMAC appealed and partially prevailed. The City's supervising engineer, Choyce Morrow, concluded that only eight of the 15 buildings were substantially damaged. But those eight would have to be elevated.

When DMAC again appealed, City inspectors conducted a field investigation, and City officials continued to analyze whether substantial damage had occurred. DMAC's Morgan Cox threatened to sue, contending the City was unlawfully withholding the permits.

B

In June 2018, DMAC sued the City, but the district court dismissed the suit as unripe. Our court reversed, ruling that the case ripened when the City's Director of Public Works, Carol Haddock, formally informed DMAC that the City had denied DMAC's permit application in July 2018. *See DM Arbor Court, Ltd. v. City of Houston*, 988 F.3d 215, 221 (5th Cir. 2021). Haddock explained that DMAC did not provide the additional information Morrow requested. Separately, Haddock also stated that the City was denying DMAC's application under § 19-19 of the flood ordinance. That

3

provision allows the city engineer to deny a permit, *inter alia*, if the proposed development could result in "[d]anger to life or property due to flooding or erosion damage in the vicinity of the site." § 19-19(a)(1). The City had never previously invoked § 19-19 to deny a permit.

During the permit appeals process, DMAC discussed selling Arbor Court to the City. But in July 2018, shortly after the permit was denied, the City declined DMAC's offer to sell Arbor Court for $24.4 million. In October 2018, HUD sent DMAC a default notice because Arbor Court remained unrepaired and several tenants had moved out of the apartment complex. DMAC and HUD negotiated the transfer of the HAP contract to a different complex. By the end of 2019, all of Arbor Court's residents had moved out and, since then, the property has sat idle. DMAC continues to pay taxes and other costs.

C

In August 2022, the district court granted summary judgment to the City on DMAC's equal protection claim but denied cross-motions for summary judgment on DMAC's Fifth Amendment takings claim. In February 2023, the case proceeded to a bench trial on DMAC's claim that the City's permit denial constituted a regulatory taking of Arbor Court. On July 11, 2023, the court entered findings of fact and conclusions of law, rejecting DMAC's takings claim. *See DM Arbor Court, Ltd. v. City of Houston*, 681 F. Supp. 3d 713, 745 (S.D. Tex. 2023).

The court first rejected DMAC's claim that the permit denial constituted a "categorical" taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). *Id.* at 740–42. The court concluded that DMAC failed to show the denial deprived DMAC of all "economically beneficial use of the property." *Ibid.* It reasoned that DMAC was not entitled to use the property as a government-subsidized apartment complex

and that another owner could put the property to some different beneficial use. *Ibid*. The court also agreed with the City's expert that an economically beneficial use could be "holding [the] property for investment purposes." *Id.* at 741.

Next, the court rejected DMAC's claim that the permit denial constituted a taking under the *Penn Central* framework. *Id.* at 745. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (examining (1) the regulation's "economic impact," (2) the regulation's interference with "distinct investment-backed expectations," and (3) "the character of the governmental action"). The court found that the first *Penn* factor cut in DMAC's favor because the denial reduced Arbor Court's value "between 42.5% and 80.5%." *DM Arbor Court*, 681 F. Supp. 3d at 743. As to the second *Penn* factor, the court found that DMAC's investment-backed expectations were disrupted, not by the City's flood ordinance, but instead by "the repetitive flooding events." *Id.* at 744. Finally, as to the third *Penn* factor, the court found the character of the government action "weigh[ed] heavily in the City's favor" because it "related to flood management and was to ensure health and safety." *Id.* at 745.

DMAC timely appealed.

## II

"On an appeal from a bench trial, we review the district court's legal determinations de novo and its factual findings for clear error." *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010).

## III

DMAC argues that the City's actions amounted to a regulatory taking of Arbor Court under either *Lucas* or *Penn Central* and that the district court erred in ruling otherwise. We agree with DMAC that the City's

application of § 19-19 of the flood ordinance (and the resulting denial of a repair permit) deprived DMAC of "all economically beneficial use" of Arbor Court and constitutes a categorical taking under *Lucas*. Accordingly, we do not consider DMAC's *Penn Central* claim.

A

The United States Constitution guarantees that "private property" shall not "be taken for public use, without just compensation." U.S. CONST. amend. V.[2] In the classic taking, the government appropriates or invades private property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945)); *see also generally Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("The Court's physical takings jurisprudence is 'as old as the Republic.'") (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002). But the government may accomplish much the same thing through "regulation of private property . . . so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393 (1922)).

The Supreme Court has identified two kinds of regulatory actions that amount to categorical or *per se* takings. The first is "where government requires an owner to suffer a permanent physical invasion of her property," *id.* at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)), and the second is where regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property," *ibid.* (quoting *Lucas*,

---

[2] The Takings Clause applies to the States through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897).

505 U.S. at 1019).[3] "Outside these two relatively narrow categories . . ., regulatory takings challenges are governed by the standards set forth in *Penn Central*." *Ibid.* (citing *Penn Central*, 438 U.S. 104); *see also, e.g.*, *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322 (*Penn Central* is "characterized by essentially ad hoc, factual inquiries designed to allow careful examination and weighing of all the relevant circumstances") (cleaned up).

With those principles in mind, we turn to DMAC's *Lucas* claim.

B

DMAC contends a categorical taking occurred because the undisputed evidence shows that denying a repair permit under Chapter 19 leaves DMAC no viable way to redevelop Arbor Court. It argues the district court legally erred by concluding otherwise. We agree.

As DMAC points out, the evidence shows that the permit denial ended Arbor Court's economic life. Both sides' experts agreed. DMAC's expert, Richard Marchitelli, testified that, given the costs of demolition, construction, and compliance with Chapter 19, "there is no economically viable, or feasible, or beneficial use of the property." The City's expert, Joseph Torzewski, reached the same conclusion: in light of Chapter 19's demands, there is currently "no identifiable economically feasible redevelopment" for Arbor Court. He added that the property's highest and best use was to hold it "for future development" until development becomes

---

[3] The Supreme Court has qualified the second category this way: "[T]he government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1026–32).

"feasible." In other words, the property should sit idle until some unknown point in the future.

This expert testimony accords with the other evidence concerning Chapter 19's impact on Arbor Court. For instance, City officials estimated that redeveloping Arbor Court in conformity with Chapter 19's elevation requirements would cost "close to $40 million." DMAC's principal Douglas Hickock, a real-estate developer, put the number at $46 million. Given these costs, the City's Housing Director, Tom McCasland, described redevelopment as "prohibitively expensive" and "economically unfeasible."

The district court acknowledged these economic realities. The court recognized that the permit denial caused Arbor Court to "los[e] most of its value," which plummeted to between $500,000 and $1 million,[4] after being appraised in 2017 at $21 million.[5] *See DM Arbor Court*, 681 F. Supp. 3d at 734. Nonetheless, the court ruled DMAC "failed to show that no economically beneficial use of the property remained." *Id.* at 741.

We agree with DMAC that the court erred for at least two reasons.

---

[4] As the district court correctly recognized, whether a property retains "residual" value is immaterial to whether the owner has been deprived of all economically beneficial use. *See DM Arbor Court*, 681 F. Supp. 3d at 740. *See also, e.g.*, *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999) ("Although the value of the subject property is relevant to the *economically viable use* inquiry, our focus is primarily on use, not value."); *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 486 (2009) ("Both in its holding and its reasoning, *Lucas* thus focuses on whether a regulation permits economically viable use of the property, not whether the property retains some value on paper.").

[5] The City argues that, after the permit denial, DMAC retained the sale value of land, as well as the value of the HAP Contract. The district court agreed. However, we also agree with the district court that this finding does not change the outcome of our analysis of the *Lucas* claim, because the HAP contract is a separate and district property interest.

First, the court suggested that one economically beneficial use could be "holding [Arbor Court] for investment purposes." *Ibid*. We disagree. The court's idea was that, while DMAC can do nothing with Arbor Court now, some future development might make it economically viable again. The same thing could be said, though, for any regulation that erases a property's present economic viability: a brighter tomorrow is only a day away.

That reasoning is incompatible with *Lucas*. Under *Lucas*, a categorical taking occurs when regulation forces an owner "to leave his property economically idle." 505 U.S. at 1019; *see also, e.g.*, *Nekrilov v. City of New Jersey*, 45 F.4th 662, 670 (3d Cir. 2022) ("[A] total taking is one that renders the property essentially idle."(citing *Lucas*, 505 U.S. at 1030)). Said another way: "[s]peculative land uses are not considered as part of a takings inquiry." *Lost Tree Village Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015) (citing *Olson v. United States*, 292 U.S. 246, 257 (1934)). Saying that a property's only remaining use is to hope for future development is the same as saying that the property must remain idle today. That is a categorical taking under *Lucas*.

To support its view, the district court quoted a pre-*Lucas* Ninth Circuit case, *MacLeod v. Santa Clara County*: "Holding property for investment purposes can be a 'use' of property." 749 F.2d 541, 547 n.7 (9th Cir. 1984). But the court overread *MacLeod*. In that case, a ranch owner was denied a permit to harvest timber but could "continue to hold the property for investment purposes, with interim use as a cattle ranch, and grazing land, the very uses for which the property was purchased." *Id.* at 547.[6] So, unlike

---

[6] Notably, the property in *MacLeod* was purchased "as a long-term investment." 749 F.2d at 543. Perhaps it made some sense, then, to consider "hold[ing] the property as an investment" one aspect of the property's "use." *Id.* at 547. In the same vein, *MacLeod* cited two takings cases brought by owners of undeveloped land held only for future development purposes. *See id.* at 547 n.7 (citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365,

here, the permit denial did not rob the property of, as the City's expert stated, all "identifiable economically feasible redevelopment." And, as noted, *MacLeod* pre-dated *Lucas* and therefore analyzed the takings claim under *Penn Central* only. *See id.* at 545.

Second, the court thought DMAC could sell the property. No categorical taking occurred, the court reasoned, because "even if DMAC could not use [Arbor Court]," a potential buyer "could . . . use it for an economically beneficial use." *DM Arbor Court*, 681 F. Supp. 3d at 742. We disagree. The case the court cited for this view, *Nekrilov*, 45 F.4th 662, does not support it.

In *Nekrilov*, a regulation curtailed short-term property leases but left available long-term uses. *Id.* at 670–72. As the Third Circuit explained, if an owner could not use the property long-term, he could sell to someone who could. *Id.* at 671 & n.3. This is true, the court emphasized, only where the regulation leaves "other underlying economic uses" for the property. *Id.* at 671 n.3. "When there are no underlying economic uses," however, "it is unreasonable to define land *use* as including the sale of the land." *Ibid.* (quoting *Lost Tree Vill.*, 787 F.3d at 1117). These principles from *Nekrilov* plainly point in DMAC's favor. As explained, the permit denial leaves Arbor Court with no viable economic use. So speculating about a sale—indeed, one that would have to be at fire sale prices—cannot defeat a *Lucas* taking claim.

Finally, we find illuminating our decision in *Vulcan Materials Co. v. City of Tehuacana*, 369 F.3d 882 (5th Cir. 2004). There, a company had a limestone mining lease on a property in a Texas town. *Id.* at 884. When the

---

384 (1926); *United States v. 156.81 Acres of Land*, 671 F.2d 336, 337 (9th Cir. 1982)). These cases have no application to Arbor Court, which is obviously not undeveloped land held for investment purposes.

town banned explosives and heavy equipment in mining, the company sued, arguing this effected a categorical taking of the company's property. *Id.* at 886, 888.[7]  The district court ruled the town had not denied all economically viable use of the property, since the company could continue mining without the banned methods. *Id.* at 886; *id.* at 885 n.2. We reversed. Although the town had not technically forbidden all mining, it had "*effectively prohibit[ed]*" it, since mining without the banned methods was not economically viable. *Id.* at 891 (emphasis added), 887 n.3.

Here, as in *Vulcan Materials*, the City's permit denial deprived DMAC of all economically viable use of Arbor Court. True, DMAC is technically free to redevelop property so long as it complies with Chapter 19. But as both sides' experts agreed, doing so consistent with Chapter 19 is not economically feasible. Yes, DMAC's expert recognized that DMAC could "build anything" it wanted on the property *if* it complied with Chapter 19. It might redevelop Arbor Court as an apartment complex or for some "alternative use." But the evidence shows that any such high-dollar redevelopment was an economic pipe dream. Instead, according to the City's own expert, the property's highest use now is to sit idle. *See Lucas*, 505 U.S. at 1019. That is precisely when *Lucas* applies. *See ibid.*; *Del Monte Dunes*, 95 F.3d at 1433.

DMAC was charged with the burden of proving that the City's permitting decision denied it all economically viable use of the property. *Price v. City of Junction, Tex.*, 711 F.2d 582, 591 (5th Cir. 1983). It met that burden by presenting evidence including the testimony of (1) its own expert, (2) the City's expert, (3) its own principal, and (4) the City's director of housing that

---

[7] Though the takings claim in *Vulcan Materials* was brought under the Texas constitution, we applied federal takings law because we assumed, *arguendo*, "that the Texas and federal takings standards are coextensive." *Id.* at 888, n.4.

any other redevelopment of the property at present would not be economically feasible. The City failed to present evidence to rebut that testimony, and indeed, neither the City nor the district court ever identified any economically viable use for the property. DMAC thus met its burden under *Lucas*.

Accordingly, the district court erred in concluding there was no categorical taking under *Lucas*.[8]

## C

The City makes one additional argument worth noting. Relying on our decision in *Adolph v. Federal Emergency Management Agency of the U.S.*, 854 F.2d 732 (5th Cir. 1988), the City contends that application of a flood ordinance like Chapter 19 can never amount to a taking. We disagree.

*Adolph* rejected a facial Takings Clause challenge to land use regulations promulgated under the National Flood Insurance Program (NFIP). *Id.* at 740; *see* 44 C.F.R. §§ 59.1, 60.3. A contrary decision, we

---

[8] In a lengthy post-argument "letter," the City contends for the first time that, even if the permit denial zeroed out all of Arbor Court's viability, no categorical taking occurred because *Lucas*'s "nuisance" exception applies. *See Lucas*, 505 U.S. at 1030 (no taking occurs when "background principles of nuisance and property law" already prohibit the use). We will not consider this late-breaking argument. It was the City's burden to show that the nuisance exception applied. *See id.* at 1031 (explaining that the state had to identify on remand the background nuisance); *Lucas v. South Carolina Coastal Council*, 424 S.E.2d 484, 485–86 (S.C. 1992) (holding South Carolina failed to identify such background principles). But the City never raised the issue before the district court. *See, e.g., Gulf Union Indus., Inc. v. Formation Sec., Inc.*, 842 F.2d 762, 765 (5th Cir. 1988) ("Affirmative defenses cannot be raised for the first time on appeal."). And on appeal it raised the issue only in its post-argument letter. So, the issue has been forfeited. *See, e.g., United States v. Guillen-Cruz*, 853 F.3d 768, 777 (5th Cir. 2017) (refusing to consider appellee's arguments that could have been, but were not, raised in appellate brief); *Hernandez v. Garcia Pena*, 820 F.3d 782, 786 n.3 (5th Cir. 2016) (refusing to consider unbriefed defense as a basis for affirmance).

explained, would "require a holding that virtually the entire [NFIP statute] is unconstitutional." *Adolph*, 854 F.2d at 737. We concluded: "the NFIP, when operating precisely as intended by Congress, results in no unconstitutional taking of plaintiffs' property." *Ibid.* (citation omitted). Accordingly, "[l]anguage in the local land-use regulations that tracks the criteria of the NFIP does not, on its face, effect a taking in violation of the fifth and fourteenth amendments." *Id.* at 740.

The district court correctly rejected the argument that *Adolph* forecloses an *as-applied* takings claim involving flood ordinances that adopt NFIP requirements, as does Chapter 19. *DM Arbor Court*, 681 F. Supp. 3d at 738. It is axiomatic that the rejection of a facial challenge does not, *ipso facto*, foreclose an as-applied challenge. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that, in "[a] facial challenge," the plaintiff "must establish that no set of circumstances exists under which the Act would be valid."); *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (holding the plaintiff could bring an as-applied challenge to a statute despite the statute having been upheld on its face).

Going further, however, the district court opined that Chapter 19's incorporation of the NFIP requirements was a "relevant consideration" that "weigh[ed] strongly against finding that a permit denial is a taking." *See DM Arbor Court*, 681 F. Supp. 3d at 738. All we need say about this observation is that it is not relevant to a *Lucas* claim. A categorical taking occurs under *Lucas* when a regulation eliminates all economically viable use of property— regardless of "the public interest advanced in support of the restraint." *Lucas*, 505 U.S. at 1015.[9] In other words, *Lucas* announced a "*per se*" test.

---

[9] *See also, e.g.*, *Good v. United States*, 189 F.3d 1355, 1361 (Fed. Cir. 1999) (in a *Lucas* claim "courts do not balance the importance of the public interest advanced by the regulation against the regulation's imposition on private property rights").

*Lingle*, 544 U.S. at 538. By contrast, the extent to which an ordinance's grounding in flood control bears on the *Penn Central* analysis is not before us, and we offer no opinion on it. *Cf. Penn Central*, 438 U.S. at 124 (considering the "character of the governmental action").

## IV

The City's denying DMAC a repair permit under Chapter 19 of its flood control ordinance effected a categorical taking of Arbor Court under *Lucas*. The district court erred in ruling otherwise.

Accordingly, the district court's judgment is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

No. 23-20385

James L. Dennis, *Circuit Judge*, dissenting:

I respectfully dissent because in my view, the district court's analysis, reasoning, and judgment are correct. The district court rejected DM Arbor Court ("DMAC")'s categorical claim under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), in its conclusions of law as follows:

> First, DMAC contends that the permit denial constituted a categorical taking under *Lucas*. "[C]ategorical treatment [is] appropriate . . . where regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015. "[T]he categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002); *see Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 626 (9th Cir. 2020) ("This is a relatively narrow and relatively rare taking category[.]" (cleaned up)).

> *Lucas* did not fully define what constitutes "the denial of all economically beneficial or productive use" such that the categorical rule is triggered. Still, *Lucas* gave some initial guidance. First, the "typical[ ]" case in which there has been a total taking involves a situation in which the government "require[es] land to be left substantially in its natural state." *Lucas*, 505 U.S. at 1018. Second, the "total deprivation of beneficial use" must be so severe as to be "from the landowner's point of view, the equivalent of a physical appropriation." *Id.* at 1017.

> Although *Lucas* speaks of economic use, not value, courts often look to a property's value when determining whether there is a taking. Indeed, the Supreme Court has subsequently stated that "[i]n the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 539 (2005);

*see Tahoe*, 535 U.S. at 332 ("[T]he categorical rule in *Lucas* was carved out for the extraordinary case in which a regulation permanently deprives property of all value.").

Thus, courts have found that where there is a significant—but not complete—reduction in the value of property, no categorical taking has occurred. *See, e.g.*, *Tenn. Scrap Recyclers Ass'n, LLC v. Bredesen*, 556 F.3d 442, 456 [] n.6 (6th Cir. 2009) (noting that the Supreme Court has upheld diminutions in value of 75% and 92.5%); *Iowa Coal Mining Co. v. Monroe Cnty.*, 257 F.3d 846, 853 (8th Cir. 2001) (75% diminution in value); *Bridge Aina Le'a*, 950 F.3d at 627–28 (83.4% diminution); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1347 (Fed. Cir. 2004) (92% loss in on part of land's value and 8% loss in another part); *Cienega Gardens v. United States*, 331 F.3d 1319, 1344 (Fed. Cir. 2003) (*Lucas* requires loss of "100% of a property interest's value").

That being said, *Lucas* may still apply even if some nominal property value remains. "Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest." *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001). Thus, courts have occasionally found a *Lucas* taking even when the property was worth some amount that slightly exceeded zero. *E.g.*, *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015).

Thus, when a property retains only a tiny residual value, "the relevant inquiry . . . is whether the land's residual value reflected a token interest or was attributable to noneconomic use." *Bridge Aina Le'a*, 950 F.3d at 628. "[A] parcel will typical[ly] retain some quantum of value even without economically viable use." *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 488 (2009). "Indeed, it is not difficult to identify other circumstances, such as purchasing a parcel to preserve development-free open space or natural land, in which a parcel may have some value despite its lack of

2

economically viable uses." *Id.* Thus, if the residual value is due to a non-economic use, a *Lucas* taking may nonetheless have occurred. But if the residual value results from a possible economic use, then there is no *Lucas* categorical taking.

Put differently, "[w]hen there are no underlying economic uses, it is unreasonable to define land use as including the sale of the land." *Lost Tree Vill. Corp.,* 787 F.3d at 1117. "[T]he mere fact that there is one willing buyer of the subject property, especially where that buyer is the government, does not, as a matter of law, defeat a taking claim." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999). But when "there are other underlying economic uses," courts "consider the plaintiffs' ability to sell the properties in determining whether there has been a total taking." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 671 n.3 (3d Cir. 2022)[.]

Thus, "[t]he crucial inquiry" is "whether the property use allowed by the regulation is sufficiently desirable to permit property owners to sell the property to someone for that use." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984) (cleaned up); *accord Nekrilov*, 45 F.4th at 671.

That being said, a property may have an economically beneficial use even if it is not profitable. "[T]he central question for a total taking is not 'whether the regulation allows operation of the property as a profitable enterprise for the owners, but whether others might be interested in purchasing all or part of the land for permitted uses.'" *Nekrilov*, 45 F.4th at 671 (quoting *Park Ave. Tower*, 746 F.2d at 139); *see MacLeod v. Santa Clara Cnty.*, 749 F.2d 541, 548 (9th Cir. 1984) ("We are unwilling to equate immediate overall profitability with the requirement of 'economic viability.'"). A plaintiff must show that "across all potential purchasers," there is no economically viable use of the property. *Nekrilov*, 45 F.4th at 671.

For example, in *Nekrilov*, 45 F.4th 662, plaintiffs challenged a regulation barring short-term rentals. One set of

plaintiffs had a monthly mortgage payment of $3,300, but could only earn $2,600 per month once the regulation too[k] effect (down from $4,500 per month absent the regulation). *Id.* at 668. The Third Circuit nonetheless concluded that the property retained economic value. *Id.* at 670–71. The fact that, for one set of plaintiffs, the rental income was less than the mortgage payment did not undermine this conclusion because the property was still being put to economic use. This application is a logical outgrowth of *Lucas*'s admonition that there is no categorical taking even when there is a 95% reduction in value. 505 U.S. at 1019 n.8.

Likewise, a property does not have to *immediately* have value to still have some economically beneficial use. Instead, "[h]olding property for investment purposes can be a 'use' of property." *MacLeod*, 749 F.2d at 547 n.7.

Applying this standard here, it is clear that DMAC has failed to show that no economically beneficial use of the property remained. It is true that the former use of the property as a multi-family HUD subsidized apartment complex was no longer possible. But the Court is not persuaded that no other economically beneficial use remains.

The Court also notes the narrow scope of the City's permit denial. The City denied one specific permit application: to repair Arbor Court so that it could function as it previously existed. The City did not deny permits for any other use. And the Court is persuaded by testimony from City officials explaining that an owner may use the property in any way that it chooses, as long as the use complied with the ordinance. The Court did not hear testimony indicating that DMAC ever looked into any way to comply with health and safety.

At some points, DMAC seems to suggest that the property was in a total loss state because there was debt on the property, and the payment on the debt would far exceed the income that the property could generate after the permit denial. But the fact that DMAC had taken out loans to finance

4

the property does not impact the total taking analysis. As discussed above, the question is whether *any* owner could use the property for an economically beneficial use. *See Nekrilov*, 45 F.4th at 671. So, even if DMAC suffered a heavy loss, and even if DMAC could not use the property, that alone does not create a *Lucas* taking. Rather, if it could sell the property for a fraction of what it had originally paid, and the buyer could then use it for an economically beneficial use, there has been no total taking, even if DMAC cannot repay its debts.

In sum, *Lucas* categorical takings are limited to the extraordinary circumstances in which no economically beneficial use of the property remains. This is not such a circumstance. Thus, no categorical taking occurred.

*DM Arbor Court, Ltd. v. City of Houston*, 681 F. Supp. 3d 713, 739–42 (S.D. Tex. 2023) (footnotes omitted) (citation modified).

These conclusions of law and the balance of the district court's opinion refute the majority's opinion and demonstrate why the district court's decision is correct and should be affirmed.[10]

For these reasons, I respectfully dissent.

---

[10] I additionally agree with the reasoning of the district court that the permit denial did not constitute a taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *See DM Arbor Court, Ltd.*, 681 F. Supp. 3d at 742–45.